UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LACI C. KAISER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:14-cv-01480-SEB-MJD |
| | ) | |
| CAROLYN W. COLVIN Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Laci Kaiser ("Plaintiff") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). *See* 42 U.S.C. §§ 416(i), 423(d). For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be **REVERSED** and **REMANDED**.

## <u>Procedural History and Background</u>

Plaintiff filed an application for DIB on May 4, 2011, alleging an onset of disability on January 25, 2007. [R. at 28.] She had past work experience as a secretary and construction worker, [R. at 38], and she alleged she was disabled because of headaches, a left ankle fracture, depression, anxiety, and mood disorder. [R. at 30.][1]

The Social Security Administration ("SSA") denied Plaintiff's claim initially on June 30, 2011 and upon reconsideration on August 9, 2011. [R. at 28.] Plaintiff requested a hearing, and on May 4, 2012, Plaintiff appeared via videoconference before Administrative Law Judge

---

[1] Plaintiff recited the relevant factual and medical background in more detail in her opening brief. [*See* Dkt. 15.] The Commissioner, unless otherwise noted herein, does not dispute these facts. [*See* Dkt. 16.] Because these facts involve Plaintiff's confidential and otherwise sensitive medical information, the Court will incorporate by reference the factual background in the parties' briefs and will articulate only specific facts as needed herein.

("ALJ") Angela Miranda. [*Id.*] Also present were Plaintiff's attorney, Mark Mora, and vocational expert Timothy Bobrowski. [R. at 46.] The ALJ concluded that Plaintiff was not disabled at any time from the alleged onset date through the date of her February 21, 2013 decision. [R. at 40.] The Appeals Council denied Plaintiff's request for review on July 10, 2014, thereby rendering the ALJ's decision final. [R. at 1-6.] Plaintiff then filed her complaint with this Court on September 10, 2014.

## Applicable Standard

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423.[2] Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step

---

[2] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or Supplemental Security Income. However, separate, parallel statutes and regulations exist for Disability Insurance Benefits and Supplemental Security Income claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). To be affirmed, the ALJ must articulate her analysis of the evidence in her decision; she "is not required to address every piece of evidence or testimony," but she must provide a "glimpse into her reasoning" and "build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176. The Court, that is, "must be able to trace the ALJ's path of reasoning" from the evidence to her conclusion. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), *as amended* (Dec. 13, 2000).

## The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirements of the Act through December 31, 2012. [R. at 30.] At step one of the sequential evaluation process, the ALJ

3

determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of January 25, 2007. [*Id.*]

At step two, the ALJ determined that Plaintiff had the following "severe" impairments: "headaches variously described as migraines, vascular headaches, [and] mixed headaches . . . with suggestion of pituitary hemorrhage or pituitary adenoma [or] Rathke cyst;" obesity; "left ankle fracture with surgical correction (ORFI);" and "mental impairments assessed as depression, anxiety, and mood disorder." [*Id.*]  At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listed impairment. [R. at 31.] The ALJ accounted for Plaintiff's mental impairments by specifically considering Listing 12.04 (affective disorders), and Listing 12.06 (anxiety-related disorders). [R. at 32.] In doing so, the ALJ employed the SSA's special technique for evaluating such impairments. [R. at 32-33.] She thus assessed the "Paragraph B" criteria, and she determined that Plaintiff had "mild" restriction in activities of daily living; had "mild" limitations in social functioning; had "moderate" difficulties in maintaining concentration, persistence, or pace; and had no episodes of decompensation of an extended duration. [R. at 32.] She thus concluded that the Paragraph B criteria were not satisfied. [R. at 33.] The ALJ then considered the "Paragraph C" criteria, but she found that the medical evidence of record did not support the existence of these criteria for either Listing 12.04 or Listing 12.06. [*Id.*]

After step three but before step four, the ALJ analyzed Plaintiff's residual functional capacity ("RFC"). She concluded that Plaintiff had RFC to perform sedentary work as defined in 20 CFR § 404.1567(a), but with certain additional limitations:

> More specifically, the claimant has the residual functional capacity to occasionally lift and carry 10 pounds and to frequently lift and carry light articles weighing less than 10 pounds. The claimant has the capacity to stand and/or walk 2 hours in an 8-hour workday and has the capacity to sit 6-8 hours in an 8-hour workday. The claimant has unlimited ability to push and pull up to the capacity

4

for lifting and carrying. The claimant has the capacity to occasionally stoop, kneel, crouch, crawl, and climb stairs and ramps. The claimant has no limitations in the ability to balance and no limitations in manipulative abilities. Environmentally the claimant should work in an environment classified as "quiet" and should have only occasional exposure to possible headache inducing agents such as dust, fumes, or other pulmonary irritants. Mentally the claimant has the capacity to understand, remember, and carry out simple, routine tasks with the capability to utilize common sense understanding to carry out instructions, to deal with several concrete variables in standardized situations, and to sustain this mental ability consistent with the normal demands of a workday including regular breaks and meal periods. The claimant has the capacity to appropriately interact with supervisor[s], coworkers, and the general-public. The claimant has the capacity to identify and avoid normal work place hazards and to adapt to routine changes in the work place.

[R. at 33.] The ALJ concluded at step four that this RFC did not allow Plaintiff to perform her past relevant work as a secretary or construction worker. [R. at 38.] At step five, the ALJ received testimony from the vocational expert and determined that a person with Plaintiff's age, education, work experience, and RFC could perform jobs such as addresser, surveillance system monitor, and call out operator. [R. at 39.] Because these jobs existed in significant numbers in the national economy, the ALJ concluded Plaintiff was not disabled. [R. at 39-40.]

## Discussion

Plaintiff alleges that the ALJ erred in three ways. She first argues that the ALJ improperly evaluated her credibility. [Dkt. 15 at 16.] She then contends that the ALJ failed to account for the impact of her headaches on her ability to maintain employment. [*Id.* at 21.] She finally argues that the ALJ erred at step three of the sequential evaluation process by not discussing whether her ankle and head impairments met or equaled certain Listings. [Dkt. 15 at 24.] Plaintiff's last argument ultimately is dispositive, and the Court addresses this argument first.

### A.  Step Three Equivalence Determination

At step three of the sequential evaluation process, the ALJ considered and rejected Listing 12.04 and Listing 12.06. [R. at 32-33.] She did not consider Listing 1.02 (major dysfunction of a joint) or Listing 11.03 (nonconvulsive epilepsy). [*See id.*] Plaintiff now contends that the ALJ erred because her impairments met or equaled these latter Listings. [Dkt. 15 at 24.] To prevail on this argument, Plaintiff "has the burden of showing that [her] impairments meet a listing, and [she] must show that [her] impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). In addition, remand may be required if the Court cannot meaningfully review the accuracy of the ALJ's step three determination. *See id.* (citation omitted) ("[T]his court has also held that an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand."); *see also Clifford*, 227 F.3d at 874 (the Court "must be able to trace the ALJ's path of reasoning" from the evidence to her conclusion).

### 1.  Listing 1.02(A)

Plaintiff in this case contends that her ankle injury satisfied Listing 1.02(A). [Dkt. 15 at 25.] This Listing requires "gross anatomical deformity" and "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)," accompanied by "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively." 20 C.F.R. § Pt. 404, Subpt. P, App.  The "inability to ambulate effectively" means "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* Such a finding is typically appropriate only when the claimant cannot walk "without the use of a hand-held

assistive device(s) that limits the functioning of both upper extremities." *Id.* Finally, the Listing requires that the inability to ambulate "must have lasted, or be expected to last, for at least 12 months." *Id.*

Plaintiff has not identified evidence indicating that her ankle impairment caused an "inability to ambulate effectively" for at least twelve months. Although Plaintiff did sustain a serious ankle fracture in September 2007, the injury healed with surgery and Plaintiff's post-operative course appeared to be unremarkable." [R. at 37.] By December of that year, Plaintiff had "full range of motion" in the ankle, and her doctor cleared her to "return to full duties." [R. at 614.] Plaintiff then received follow-up care from Dr. Jennifer Vivio, and in February, March, and July of 2008, Dr. Vivio observed that Plaintiff's gait was "normal." [R. at 311, 314, 316.] Dr. Vivio noted that Plaintiff limped on her left ankle, [*id.*], but she described nothing akin to an "extreme limitation" on the ability to walk, and she did not indicate that Plaintiff required any kind of "hand-held assistive device" to ambulate. [*See id.*]

In August 2008, Plaintiff again injured her ankle, this time when she missed a step while walking down stairs. [R. at 540.] This injury resulted in swelling and tenderness, [R. at 542], but again, the record does not indicate that the injury impaired Plaintiff's ability to ambulate. In October 2008, for instance, Dr. Scott Rubinstein examined Plaintiff's ankle and did not describe any impairment in Plaintiff's gait. [*See* R. at 727.] Then, at Plaintiff's state agency consultative examination, Plaintiff's doctor observed "[n]o limp, no unsteadiness," and a "[n]ormal gait." [R. at 693.] Finally, Plaintiff's treating physician specifically indicated that Plaintiff did not require a "hand-held assistive device . . . for ambulation." [R. at 756.]

Together, these findings indicate that Plaintiff did not meet the criteria for Listing 1.02(A), and so even if the ALJ had discussed this Listing, the ALJ's discussion would not have changed the result of this case. Any error in the ALJ's decision on this point was therefore

harmless, and the Court need not remand this case for further consideration of this Listing. *See, e.g., Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (remand unnecessary "if it is predictable with great confidence that the agency will reinstate its decision on remand").

### 2. Listing 11.03

Plaintiff argues that her migraines met or equaled Listing 11.03. [Dkt. 15 at 26.] This Listing requires "nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The seizures must occur "more frequently than once weekly in spite of at least 3 months of prescribed treatment," and they must be accompanied by "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." *Id.*

The Commissioner contends that Plaintiff's "migraine symptoms did not come anywhere close to equaling" Listing 11.03 because "Plaintiff was never diagnosed with epilepsy" and "[n]o seizures were ever documented." [Dkt. 16 at 15.] This argument misses the mark. The Listing of Impairments contains no specific entry for migraines or headaches, and the SSA thus routinely considers these impairments under the criteria for Listing 11.03. *See, e.g., Keller v. Colvin*, No. 1:13-CV-00104-TWP-MJD, 2014 WL 948889, at *5 (S.D. Ind. Mar. 10, 2014) ("[M]igraines, though unlisted, may be medically equivalent to Listing 11.03."); *Kwitschau v. Colvin*, No. 11 C 6900, 2013 WL 6049072, at *3 (N.D. Ill. Nov. 14, 2013) (citation omitted) ("There is no specific impairment listing for migraines. However, they can be analogized to the provisions for petit mal, or non-convulsive, seizures in § 11.03 of the Listing of Impairments."). A claimant may therefore demonstrate equivalence to Listing 11.03 by showing that her migraines—rather than her seizures—cause functional impairments equivalent to those described in the Listing. *See Kwitschau*, 2013 WL 6049072, at *3 ("In order to meet that Listing, Claimant must suffer from

8

more than one medically severe migraine headache per week despite at least three months of prescribed treatment.").

The SSA provides examples of such equivalence determinations in its Program Operations Manual System ("POMS").[3] POMS § DI 24505.015, *available at http s://secure.ssa.gov/apps10/poms.nsf/lnx/0424505015* (last visited June 12, 2015). One example reads as follows:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her [activities of daily living]. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, non- convulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

*Id.* As explained below, Plaintiff's migraines in this case closely match this example.

First, the record plainly shows that Plaintiff experienced "chronic migraine headaches," [*see, e.g.*, R. at 32 ("migraine headaches"); R. at 335 ("migraines"); R. at 619 ("chronic headaches"); R. at 726 ("migrainous headaches")], and that Plaintiff "on a regular basis" sought treatment for these headaches. [*See* R. at 35-36.] The ALJ did note that Plaintiff experienced a "significant gap" in treatment between August 2009 and November 2011, [R. at 36], but, as described below, Plaintiff had reasonable explanations for this gap. In addition, after the gap in

---

[3] This manual is not legally binding on the SSA or the courts. *See Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989). The SSA, however, cannot entirely ignore the POMS manual. *See Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003) ("While [POMS] administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect[.]); *see also Gossett v. Colvin*, 527 F. App'x 533, 536 (7th Cir. 2013) (faulting Appeals Council for not complying with POMS DI 12045.027(D)(1)(b) and (2)(b)). In addition, this Court has previously reversed an ALJ for ignoring the POMS's guidance on headaches, *see Keller*, 2014 WL 948889, at *6, and for the reasons stated therein, the Court in this case again finds it appropriate to consider whether the ALJ complied with POMS.

treatment ended, Plaintiff continued to experience headaches and continued to see her primary care physician for medication management. [*See, e.g.*, R. at 738 (review of systems positive for headaches), R. at 752 ("[Plaintiff] still has near constant migraines[.]").] The record thus supports a finding that Plaintiff's impairment met the initial criteria described in the POMS manual.

Next, the frequency and treatment of Plaintiff's headaches are consistent with the POMS manual. The manual describes headaches that "last anywhere from 4 to 72 hours" and that "occur at least 2 times or more weekly." Plaintiff in this case explained that her migraines can last up to three days each week, [R. at 60], and Plaintiff's doctor reported that she had "1-2 bad migraines a [week]." [R. at 531.] In addition, the manual describes that the hypothetical claimant "takes medication as her doctor prescribes," and, as explained more fully below, Plaintiff used a wide array of prescription medications to try to resolve her headaches.

The symptoms associated with Plaintiff's headaches also closely track the symptoms in the POMS manual. The manual describes "throbbing," "nausea," and "photophobia" that require the claimant to "lie down in a dark and quiet room for relief." Here, Plaintiff testified that her migraines would leave her feeling "physically sick," [R. at 59]; her medical records indicated that her migraines were accompanied by "pounding, photophobia, [and] phonobia" [R. at 528]; and Plaintiff explained that she had to "[g]o to [a] room and just lie down" until the pain passed. [R. at 66.] The only symptoms in the POMS manual that are arguably lacking from Plaintiff's experience are "aura" or "alteration of awareness." The POMS manual, however, provides only one example of the symptoms that might satisfy Listing 11.03, and so the lack of all such symptoms does not necessarily preclude a finding of equivalence. *See Keller*, 2014 WL 948889, at *5 (remanding where claimant "experienced all of the[] symptoms . . . [w]ith the exception of 'alteration of awareness'"). Thus, even if the record does not currently contain evidence of all of

the POMS symptoms, the ALJ should have at least considered whether Plaintiff's impairment met or equaled the Listing. *See id.* ("[T]he case is worth remanding for further consideration of the POMS.").

The final element from the example in the POMS manual is interference with the claimant's activities of daily living. The ALJ in this case found that Plaintiff had only "mild" difficulties in activities of daily living. [R. at 32.] As explained more fully below, however, this finding was based on an incomplete picture of the functional reports in the record. [*See* R. at 223-33, 237-49.] In addition, Plaintiff notes that she copes with her migraines by seeking out a dark and quiet room and sleeping until the migraine passes. [Dkt. 17 at 5; *see also* R. at 236.] Such coping mechanisms would naturally interfere with Plaintiff's ability to perform daily activities, and Plaintiff's migraines thus satisfy this last criterion of the POMS example.

Based on the above analysis, the ALJ's step three finding was deficient. Plaintiff met her burden of submitting medical evidence that likely satisfied the criteria of Listing 11.03, and the ALJ was accordingly obligated to analyze that Listing. *See Ribaudo*, 458 F.3d at 583 ("[A]n ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand."). Here, the ALJ offered no analysis of Listing 11.03 whatsoever. [*See* R. at 32.] Her analysis was worse than simply "perfunctory;" it was nonexistent, and remand is therefore required for the ALJ to properly assess whether Plaintiff's migraines meet or medically equal Listing 11.03.

### B. Credibility Determination

During the hearing before the ALJ, Plaintiff testified that her migraines prevented her from working full-time. [R. at 59.] She stated that her headaches "never" went away, and that they would often intensify until she was "physically sick." [*Id.*] She described an inability to tolerate light and sound, [*id.*], and she said that her migraines could last "anywhere from a day to

three days" each week. [R. at 60.] During the migraines, she experienced "pressure" and "pounding" as if she had been "whacked in the back of the head," and she would have to "[g]o to [a] room and just lie down" until her symptoms subsided. [R. at 66.]

The ALJ incorporated limitations based on these allegations in the hypothetical questions she posed to the vocational expert. [R. at 83.] In particular, she asked whether a person of Plaintiff's age, education, and RFC could perform substantial gainful activity if that person also had to take unscheduled breaks; had to be absent from work for several days each month; or had to periodically be off task to cope with the symptoms that Plaintiff described. [*Id.*] The vocational expert replied that such a person would not be able to work full-time, [*id.*], with the implication that, if Plaintiff's allegations were accepted as true, a finding of disability was appropriate.

Ultimately, however, the ALJ found that Plaintiff's statements were "not entirely persuasive." [R. at 37.] The ALJ stated that she accepted that Plaintiff might not be able to perform her past work as a secretary or construction worker, but the ALJ then concluded that Plaintiff's statements were "not persuasive to the extent [Plaintiff] alleges all work is now precluded." [*Id.*] Plaintiff now challenges the ALJ's credibility determination. [Dkt. 15 at 16-20.] She primarily contends that the ALJ placed too much weight on Plaintiff's brief employment in 2008 and Plaintiff's gap in treatment during 2010 and 2011. [*See id.*]

This Court's review of an ALJ's credibility determination is deferential: "An ALJ is in the best position to determine a witness's truthfulness and forthrightness; thus, this court will not overturn an ALJ's credibility determination unless it is patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (citation and quotation marks omitted). The ALJ, however, must still support her credibility finding with "specific reasons" that are "supported by the evidence in the case record." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting SSR

96-7p). The ALJ must also consider factors such as the claimant's work-related activities and activities of daily living; the duration, frequency, and intensity of the claimant's symptoms; the symptoms' precipitating and aggravating factors; the effects of medication; the effects of treatment other than medication; and any other relevant factors. 20 C.F.R. § 404.1529(c). The ALJ may not discount a claimant's statements solely because they are unsupported by objective medical evidence, *see* SSR 96-7p, but the ALJ may consider whether the claimant's statements are consistent with such evidence. *See* 20 C.F.R. § 404.1529(a).

The ALJ in this case began with a review of the objective medical evidence of Plaintiff's headaches. She noted that Plaintiff was hospitalized with complaints of headaches in early 2007. [R. at 34 (citing R. at 320).] At that time, an MRI revealed evidence of a pituitary hemorrhage and/or cyst, either or both of which may have caused Plaintiff's headaches. [*See id.*] Another MRI in August 2007 gave similar results, [R. at 35 (citing R. at 338-39)], as did an MRI in July 2008. [*Id.* (citing R. at 330).] Based on such findings, the ALJ ultimately concluded that "the record . . . provides objective evidence that [Plaintiff's] headaches are medically determined and severe," [R. at 38], and the ALJ's discussion of the objective evidence thus supports Plaintiff's credibility.

The ALJ, however, then discounted the significance of this finding. She first turned to Plaintiff's work-related activities: she noted that in 2008—well after the alleged date of onset of disability—Plaintiff worked as a receptionist for Brown Sprinkler Corporation while the corporation's regular receptionist was on medical leave. [R. at 38.] The employer reported that Plaintiff worked an average of 24 hours per week for approximately five months, and that Plaintiff had no difficulties fulfilling the requirements of the position. [*Id.*; *see also* R. at 220-222).] These observations naturally detracted from Plaintiff's allegations that her migraines were entirely disabling, *see, e.g.*, SSR 96-7p ("[The ALJ should consider the] consistency of the

individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's . . . efforts to work."), and the ALJ relied in part on these observations in concluding that Plaintiff was not fully credible. [*See* R. at 37-38.]

Plaintiff nonetheless contends that the ALJ's analysis of her work was erroneous. She argues that her job in 2008 was a temporary, part-time position, and that "when it became more full time than expected and her condition worsened again," she was forced to "stop working due to her health." [Dkt. 15 at 17.] The record does not support this argument: Plaintiff herself testified that she "started full-time and then it was dropping down to more part-time," [R. at 54], and so at least initially, Plaintiff was apparently able to work full-time even in spite of her allegedly disabling headaches. In addition, Plaintiff testified that she left the job because "the headaches were getting bad," [R. at 55], but the employer reported that Plaintiff's tenure ended because the company's regular receptionist returned from medical leave. [R. at 220.] The ALJ also noted that the employer indicated that the company would hire Plaintiff again if given the opportunity, [R. at 38 (citing R. at 222)], suggesting that Plaintiff did not end her employment because she could no longer fulfill her job duties. At the very least, then, Plaintiff's statements about her 2008 employment were inconsistent with other evidence in the record, indicating that her statements as a whole were not necessarily as credible as they otherwise would have been.

Plaintiff also argues that the ability to work does not necessarily imply that she was not disabled. She notes that the Seventh Circuit has repeatedly observed that even those claimants who are entitled to benefits may nonetheless hold jobs, [Dkt. 15 at 17-18 (citing *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998))], and she thus asserts that her 2008 employment should not weigh against her claim for benefits. [*See id.*]

14

Plaintiff misinterprets the ALJ's decision. The ALJ in this case did not conclude that, because Plaintiff could work for five months in 2008, Plaintiff was not disabled. To the contrary, the ALJ merely discussed Plaintiff's employment history as one factor to be assessed in the ALJ's overall credibility analysis. [*See* R. at 38.] This was entirely appropriate: The SSA itself specifically directs that an ALJ's credibility analysis should include a claimant's "prior work record and efforts to work," SSR 96-7p, and the Seventh Circuit has similarly observed that an ALJ may appropriately consider whether a claimant has engaged in work-related activities. *See Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013). Here, then, the ALJ was justified in concluding that, because Plaintiff was able to complete work-related tasks as a secretary in 2008, her testimony about not being able to complete such tasks was not as credible as it otherwise would have been. Plaintiff's 2008 employment history is thus an indication that her testimony was not credible, and this history supports the ALJ's ultimate finding that Plaintiff's statements were "not entirely persuasive."

The ALJ then turned to Plaintiff's treatment history. She noted that Plaintiff frequently complained of headaches, received prescriptions for numerous medications, and received treatment from several doctors. [R. at 35-36.] When medication failed to improve her condition, Plaintiff's doctors recommended occipital nerve blocks, which were administered in August 2007. [R. at 35 (citing R. 337-39).] In September 2007, however, Plaintiff reported that the procedure "made no difference," [R. at 332], and her doctor stated that there were "only so many options left . . . to try to get [Plaintiff] headache relief." [R. at 332.] Plaintiff's doctors then altered her medication regimen, but in November 2007, Plaintiff reported that the changes did not improve her symptoms. [R. at 35 (citing R. at 564).]

In early 2008, Plaintiff received care from Dr. Jennifer M. Vivio, M.D. [R. at 35.] That doctor prescribed another change in Plaintiff's medication, [R. at 316], and Plaintiff initially

reported that the new medicine improved her symptoms. [R. at 313.] This improvement, however, was short-lived, and Plaintiff in October 2008 was admitted to the Diamond Headache Clinic. [R. at 729-34.] There, Plaintiff reported that she had tried nearly forty different prescription drugs to treat her headaches, [R. at 730], but that few if any improved her symptoms. [*See id.*] The clinic then placed her in a "detoxification" program to purge her system or prescription drugs. [R. at 35.]

After her release, Plaintiff returned to her family doctor in June and August of 2009. [R. at 36.] The ALJ described these visits as "more related to the claimant's mental health" than the claimant's headaches, [*id.*], but this mischaracterizes the treatment records. At the June 2009 appointment, Plaintiff complained that she had a "migraine [that] won't go away." [R. at 531.] The ALJ discounted this statement on the grounds that it was an isolated event caused by a trip to an amusement park, [R. at 38], but this ignores the fact that Plaintiff also stated that she continued to have "1-2 bad migraines a [week]," [R. at 531], and that Plaintiff's doctor prescribed both Imitrex and injections of ketorolac tromethamine to treat Plaintiff's headaches. [R. at 532-33.] Then, at the August 2009 appointment, Plaintiff presented with a headache that had lasted for three days and that was accompanied by "pounding, photophobia, [and] phonobia." [R. at 528.] She stated that the Imitrex "didn't help at all" and that the injections provided "marginal" relief. [R. at 530.] She then "elected to go home [to] see if that would enable her to rest and resolve the [headache]." [*Id.*]

In sum, Plaintiff complained of and received treatment for her migraines at both of the 2009 appointments with her primary care physician. It was therefore erroneous for the ALJ to discount this portion of Plaintiff's treatment history as related more to Plaintiff's mental problems, and this portion of the ALJ's analysis does not support her ultimate finding regarding Plaintiff's credibility.

16

The ALJ next observed that, after the August 2009 appointment, the record contained a "significant gap in evidence of treatment," [R. at 36], as Plaintiff did not see her primary care physician at any point between August 2009 and late 2011. [*See id.*] The ALJ interpreted this gap in treatment to mean that Plaintiff's "symptoms [had] quieted." [R. at 38.] This, in turn, could mean that Plaintiff's symptoms were not as severe as she described at the hearing, such that the ALJ was justified in concluding that Plaintiff was not entirely credible. *See* SSR 96-7p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints[.]").

An ALJ, however, is not free to draw such a conclusion in all cases of infrequent treatment. Instead, the ALJ must first "consider[] any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id.* As explained below, the ALJ in this case did not comply with this requirement.

The ALJ first speculated that Plaintiff's "detoxification" at the headache clinic resulted in Plaintiff's gap in treatment. [R. at 38 ("This period . . . parallels the period when the claimant was medication free.").] This speculation, however, overlooks the fact that, by June of 2009, Plaintiff's physician had placed Plaintiff back on several prescription medications. [*See* R. at 531; *see also* R. at 529-30.] Thus, even if Plaintiff was momentarily "medication free" after her experience at the headache clinic, that period ended well before the relevant gap in Plaintiff's treatment. It was therefore erroneous for the ALJ to treat this gap in appointments as a result of the clinic's recommended course of treatment.

Next, the SSA cautions that ALJs should acknowledge that claimants who have not sought treatment "may be unable to afford treatment and may not have access to free or low-cost medical services." SSR 96-7p. Plaintiff in this case specifically testified that although her

physician had prescribed injections to treat her pain, she stopped receiving the injections because "[she] can't afford it." [R. at 64.] In addition, other evidence in the record indicated that Plaintiff had scarce financial resources. [*See, e.g.*, R. at 230 ("She really has no money to handle. They have one income and money is very tight."); R. at 692 ("she can't afford her care anymore").] The ALJ never mentioned this testimony or this evidence when evaluating Plaintiff's gap in treatment, [R. at 38], and the ALJ thus erred by ignoring this aspect of SSR 96-7p.

The Commissioner nonetheless defends the ALJ's analysis on the grounds that the ALJ **did** acknowledge that the ALJ noted that Plaintiff could not afford medication for her depression. [Dkt. 16 at 11; *see also* R. at 36 ("[C]laimant was complaining about the cost of the Seroquel and Cymbalta.").] If anything, however, this notation only makes the ALJ's error more egregious: the ALJ **knew** that Plaintiff had difficulty paying for the medication for her **mental** impairments, and it thus would have been reasonable to inquire about whether Plaintiff **also** had difficulty paying for her **physical** impairments. That the ALJ did not do so simply confirms that her analysis was deficient.

Finally, the ALJ's consideration of the gap in treatment ignores the context of this gap. By August 2009, Plaintiff had tried nearly forty different medications, [R. at 730], she had tried numerous analgesic injections, [R. at 533], and she had received treatment at a specialized headache clinic. [R. 729-34.] None of these treatment efforts proved successful, [*see* R. at 752], and indeed, Plaintiff had been informed by her doctors that she was running out of treatment options. [R. at 332.] In these circumstances, Plaintiff's decision to forgo treatment cannot be viewed as evidence that she was exaggerating her symptoms. *See Ribaudo v. Barnhart*, 458 F.3d 580, 585 (7th Cir. 2006) ("[F]ailure to pursue ineffective treatments . . . cannot be a sound basis for the ALJ's adverse credibility finding."). Plaintiff's gap in treatment, in other words, was not an indication that her symptoms had "quieted" or that her chronic migraines had suddenly

resolved; instead, the gap was simply an indication that Plaintiff had resigned herself to enduring those symptoms. [*See* R. at 752 ("[Plaintiff] still has near constant migraines[,] but she just endures them since nothing really helped them much.").] Viewed in this light, the gap in Plaintiff's treatment cannot reasonably be seen as evidence that Plaintiff's symptoms were less severe than she described, and the ALJ's analysis of this issue was therefore erroneous.

The ALJ also considered Plaintiff's activities of daily living. [R. at 32, 38.] At step three of the evaluation process, the ALJ described Plaintiff's limitation in this area as "mild." [R. at 32.] She relied primarily on a functional report from Plaintiff's mother, [*see* R. at 223-33,] which, according to the ALJ, indicated that Plaintiff was "able to do light housekeeping, fix meals, get her two children ready for school, care for the family dogs, and use the computer." [R. at 32.] The ALJ added that Plaintiff's "own functioning report" corroborated these statements, [*id.*], and she emphasized in constructing Plaintiff's RFC that Plaintiff was "taking care not only of her own children but also the children of her sister-in-law." [R. at 38.] Based in part on these activities, the ALJ found that Plaintiff's complaints about the functional impact of her symptoms were exaggerated. [*See id.*]

The ALJ, however, did not acknowledge the evidence that contradicted her conclusion. First, the functional report from Plaintiff's mother indicated that Plaintiff could participate in certain activities only "on **good** days." [R. at 226 (emphasis added).] This report was thus not inconsistent with Plaintiff's statements that, on **other** days, she must cope with her migraines by lying down and avoiding activity. [R. at 66, 236.] In addition, Plaintiff explained the she completes some activities by structuring them around her headaches: in the morning, for instance, she helps her children "get ready for school," but then she "go[es] back to bed" to "try and ride out the migraine." [R. at 236.] Similarly, Plaintiff helps her children when they get home after school, but Plaintiff then "go[es] back to bed when [her] husband gets home" and can

care for the children himself. [*Id.*] Finally, the functional reports from Plaintiff's mother and Plaintiff's testimony before the ALJ both indicated that, even if Plaintiff was able to perform certain activities, she was not able to perform other activities. [*See, e.g.*, R. at 64-65 (grocery shopping); R. at 229 (yard work); R. at 230 (socializing).]

By failing to mention these aspects of Plaintiff's activities of daily living, the ALJ abdicated her responsibility to base her decision upon "**all** the relevant evidence." *Herron*, 19 F.3d at 333 (emphasis added). The ALJ naturally was not required to discuss each and every piece of evidence cited above, *see, e.g.*, *Carlson*, 999 F.2d at 181, but by focusing only on those activities that Plaintiff could perform—and by ignoring those limitations that Plaintiff nonetheless experienced—the ALJ conducted an incomplete analysis of Plaintiff's activities of daily living.

Ultimately, then, the Court is hesitant to uphold the ALJ's credibility determination. Although the ALJ did appropriately evaluate Plaintiff's temporary return to work in 2008, the ALJ nevertheless committed several errors: she mischaracterized Plaintiff's 2009 treatment; she improperly analyzed the gap in Plaintiff's treatment; and she offered at best an incomplete picture of the effect of Plaintiff's impairments on Plaintiff's daily activities. Whether these errors were sufficient to render the ALJ's determination "patently" wrong, *Skarbek*, 390 F.3d at 504, is perhaps debatable, but the Court notes that—as described above—remand is already required so that the ALJ may address whether Plaintiff's impairments met or medically equaled Listing 11.03. The Court will thus resolve any doubt in favor of the claimant, and the ALJ on remand must reconsider her analysis of Plaintiff's credibility in light of the deficiencies outlined above.

### C.  Discussion of Headaches

Plaintiff's final argument is that the ALJ "failed to discuss the impact of [Plaintiff's] severe migraines and headaches on the ability to perform and maintain employment." [Dkt. 15 at

21.] She contends that the ALJ omitted any migraine-based restrictions from her RFC analysis, and she asks the Court to remand the case for a correction of this error. [*Id.* at 22-23.]

This argument is intertwined with Plaintiff's credibility contentions: the ALJ determined that some of Plaintiff's complaints about the symptoms of her migraines were not credible, [R. at 38 ("[Plaintiff's] headaches are medically determined and severe. However, the evidence does not support the allegations that the claimant's limitations are to the extent alleged.").], and the ALJ accordingly omitted those complaints in constructing Plaintiff's RFC. [*See id.*] As described above, however, the ALJ on remand must reconsider Plaintiff's credibility. If the ALJ determines after reconsideration that Plaintiff's complaints are in fact credible, then the ALJ must incorporate those complaints in constructing a new RFC. *See, e.g.*, *Dykes v. Astrue*, No. 1:12-CV-00370-MJD, 2013 WL 125164, at *7 (S.D. Ind. Jan. 8, 2013) ("The RFC determination necessarily must take into account the claimant's subjective complaints[.]"). Any deficiency in the ALJ's current RFC will thus be repaired on remand, and the Court will leave it to the ALJ to assess at that time whether Plaintiff's RFC should include additional limitations related to her migraines.

## **Conclusion**

For the foregoing reasons, the Court finds that substantial evidence does not support the ALJ's decision that Laci C. Kaiser is not entitled to Disability Insurance Benefits. The Magistrate Judge therefore recommends that the Commissioner's decision be **REVERSED** and **REMANDED**. On remand, the ALJ must reevaluate Kaiser's credibility and assess whether Kaiser's impairments meet or medically equal Listing 11.03. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days

after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date:  06/18/2015

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov